Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SOLOMON LIPSHUTZ, derivatively on behalf of Nominal Defendant TERADATA CORPORATION., <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN MCMILLAN, LISA R. BACUS, TIMOTHY C.K. CHOU, DANIEL R. FISHBACK, MICHAEL P. GIANONI, TODD E. MCELHATTON, KIMBERLY K. NELSON, JOANNE B. OLSEN, JOHN G. SCHWARZ and CLAIRE BRAMLEY, <br><br> Defendants, <br><br> and <br><br> TERADATA CORPORATION, <br><br> Nominal Defendant. | Civil Action No. **'25CV1121 RSH VET** <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Solomon Lipshutz, by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Teradata Corporation ("Teradata" or the "Company") against the current members of the Company's Board of Directors (the "Board") and the Company's former Chief Financial Officer ("CFO") (the "Individual Defendants") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to

- 1 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities class action complaint filed against the Company and its officers and directors, transcripts of Teradata conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.     This is a stockholder derivative action brought against certain of the Company's current and former directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.     Teradata is an enterprise software company that develops and sells database analytics software. In recent years, Teradata undertook a strategic shift from its traditional on-premises data warehouse business to a cloud-based subscription model.  In connection with this shift, the Company offers Teradata VantageCloud which is a "flexible, connected, and modern cloud platform" and Teradata VanatageCore, which operates on-premises, and integrates with its cloud offerings to "enable hybrid environments."[1]

3.     As part of the transition, the Company began emphasizing metrics such as  Total Annual Recurring Revenue ("ARR"), stating that cloud-based ARR ("Public Cloud ARR")[2] best reflected its performance in the cloud segment and would be a key driver of shareholder value.

---

[1] *See* CrowdStrike's Annual Report filed with the SEC on February 21, 2025 ("2024 10-K") at 5.

[2] In its 2024 10-K,  the Company defines Total ARR as "annual value at a point in time of all recurring contracts, including subscription, cloud, software upgrade rights, and maintenance" excluding "managed services and third-party software." Public Cloud ARR or Cloud ARR (included within Total ARR) is defined as "annual value at a point in time of all contracts related to public cloud

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

4.      The Company and its directors and officers consistently represented that Teradata was successfully executing its cloud transformation strategy. They projected robust growth in Public Cloud ARR and Total ARR and expressed confidence that the Company would meet its financial goals, touting increasing customer migrations, expanding cloud usage, and new customer acquisition. These public statements created the impression that the transition to the cloud was progressing according to plan and that demand for Teradata's cloud offerings was strong and accelerating.

5.      Indeed, in February 2023, the Company issued guidance for 2023 of a "53% to 57% year-over-year" increase in Public Cloud ARR and a 6% to 8% increase for Total ARR year-over-year and over the next year, the Company and its directors and officers reaffirmed the ARR guidance in SEC filings and public statements.

6.      However, at the time the Company was issuing robust ARR guidance, at least two significant on-premises customers had already informed Teradata that they would not be migrating to the cloud platform. Additionally, the Company was experiencing customer erosion and faced an uphill battle to close deals. Therefore, the Individual Defendants recognized that ongoing customer erosion and weak demand for Teradata's cloud offerings posed a significant risk to the Company's financial performance and its ability to meet growth targets, yet their disclosures regarding this risk were not timely and adequate under the securities laws, and their continued optimistic statements about demand trends and revenue potential were materially misleading once the extent of these headwinds was known or should have been known internally.

7.      On December 7, 2023, at a technology conference, CFO Claire Bramley ("Bramley") disclosed that a significant eight-figure cloud deal was at risk but reassured investors that the Company would still meet its ARR guidance. Following this disclosure, the Company's stock declined by more than 6% in one day.

8.       On February 12, 2024, Teradata announced its Q4 and full-year 2023 financial results, reporting that both Public Cloud ARR and Total ARR had fallen short of prior guidance, growing a

implementations of Teradata VantageCloud and does not include ARR related to private or managed cloud implementations."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

mere 48% and 5%, respectively. The Company also issued weak ARR guidance for 2024. In the related earnings call with financial analysts and investors, President and Chief Executive Officer ("CEO") Steven McMillan ("McMillan") acknowledged continued erosion in the company's on-premises business and attributed missed ARR expectations to timing issues, specifically the slippage of several large deals.

9. Further, Defendants McMillan and Bramley admitted that the Company had known of significant customer erosion *over the last three years,* which would have an approximate 4% to 5% negative impact on Total ARR in the first half of 2024, even after the impact to the Company's 2023 financials. Despite this internal knowledge, the Company failed to incorporate this data into its financial forecasts and the Individual Defendants failed to disclose the lackluster demand for Teradata's cloud offerings, misleading investors.

10. Following the disclosure of the missed guidance and the state of the Company's true financial condition, Teradata's stock fell $10.57 per share or more than 21% the next day.

11. In the wake of the disclosures regarding the Company's true financial and operating condition, a securities class action was filed against the Company, CEO McMillan, and CFO Bramley captioned *Ostrander v. Teradata Corporation et al.*, No. 3:24-cv-01034-CAB-MSB (the "Securities Class Action"). As such, the Company is now subject to substantial liability and will be forced to expend significant sums to defend itself and its directors and officers.

12. Confidential witnesses in the Securities Class Action who are former Teradata employees confirm that senior executives, including Defendants McMillan and Bramley, were aware of significant sales delays, deal slippage, and product deficiencies that jeopardized the Company's ability to meet its ARR guidance. Former employees reported that deal risks were regularly discussed in meetings, tracked through Salesforce, and escalated to top leadership. They also detailed internal pressure to manipulate sales forecasts and conceal product shortcomings, including staging mock demonstrations when key features were non-functional.

13.     On May 31, 2025, Defendant Bramley abruptly stepped down from her position as CFO.

14.     As a result of the Individual Defendants' violations of the securities laws, breaches of fiduciary duty, and other misconduct, Teradata has suffered substantial damages, including irreparable harm to its reputation. Notably, all stockholders did not equally bear the impact of these actions. During the time that Teradata's stock price was artificially inflated due to false statements and material omissions, Defendant McMillan sold 46,909 of his Teradata shares, reaping nearly $2 million in illegal proceeds.

15.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent.  In the absence of this action, Teradata will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.  JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This Court has jurisdiction over each Defendant named herein because Teradata maintains its headquarters and does substantial business in this District and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

## III.    THE PARTIES

### A.    Plaintiff

20.    Plaintiff Solomon Lipshutz purchased Teradata stock on May 29, 2008, and has held Teradata common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.    Defendants

#### 1.    Nominal Defendant Teradata

21.    Teradata is a Delaware corporation with its principal executive offices located at 17095 Via Del Campo San Diego, California 92127. Its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TDC."

#### 2.    Individual Defendants

22.    Defendant McMillan is the President, CEO, and a Teradata director since June 2020 and is a member of the Executive Committee. Since 2023, McMillan received the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2023 | $800,000 | $12,789,835 | $950,000 | $192,914 | $14,732,749 |
| 2024 | $800,000 | $15,633,777 | $800,000 | $184,542 | $17,418,309 |

23.    Defendant Lisa R. Bacus ("Bacus") is a Teradata director since January 2015 and a member of the Nominating and Governance Committee. Since 2023, Bacus has received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|-----------------------------|--------------|-------|
| 2023 | $65,000 | $271,806 | $336,806 |
| 2024 | $65,000 | $235,033 | $300,033 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

24.    Timothy C.K. Chou ("Chou") is a Teradata director since January 2017 and is a member of the Compensation and People Committee. Since 2023, Chou received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $70,000 | $271,806 | $341,806 |
| 2024 | $70,000 | $235,033 | $305,033 |

25.    Defendant Daniel R. Fishback ("Fishback") is a Teradata director since January 2017, Chair of the Compensation and People Committee, and a member of the Executive Committee. Since 2023, Fishback received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $95,000 | $271,806 | $366,806 |
| 2024 | $95,000 | $235,033 | $330,033 |

26.    Defendant Michael P. Gianoni ("Gianoni") is Chair of the Teradata Board since February 2020 and a Teradata director since 2015. Gianoni is Chair of the Executive Committee and the Nominating and Governance Committee. Since 2023, Gianoni received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $200,000 | $271,806 | $471,806 |
| 2024 | $200,000 | $235,033 | $435,033 |

27.    Defendant Todd E. McElhatton ("McElhatton") is a Teradata director since June 2022 and a member of the Audit Committee and an Audit Committee Financial Expert. Since 2023, McElhatton received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $75,000 | $271,806 | $346,806 |
| 2024 | $75,000 | $235,033 | $310,033 |

28.    Defendant Kimberly K. Nelson ("Nelson") is a Teradata director since November 2019 and is Chair of the Audit Committee, and an Audit Committee Financial Expert, and a member of the Executive Committee. Since 2023, Nelson received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|

- 7 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| 2023 | $110,000 | $271,806 | $381,806 |
| 2024 | $110,000 | $235,033 | $345,033 |

29.     Defendant Joanne B. Olsen ("Olsen") is a Teradata director since June 2018 and a member of the Audit Committee. Since 2023, Olsen has received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $75,000 | $271,806 | $346,806 |
| 2024 | $75,000 | $235,033 | $310,033 |

30.     Defendant John G. Schwarz ("Schwarz") is a Teradata director since September 2010 and a member of the Compensation and People Committee. Since 2023, Schwartz has received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $70,000 | $271,806 | $341,806 |
| 2024 | $70,000 | $235,033 | $305,033 |

31.     Defendant Bramley served as the CFO of Teradata from June 2021 through May 31, 2025. Since 2023, Bramley received the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2023 | $500,000 | $4,604,344 | $475,000 | $107,996 | $5,687,340 |
| 2024 | $504,538 | $6,057,245 | $416,000 | $105,082 | $7,082,865 |

32.     Defendants McMillan, Bacus, Chou, Fishback, Gianoni, McElhatton, Nelson, Olsen, Schwarz, and Bramley are referred to herein as the "Individual Defendants."

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES

33.     By reason of their positions as officers or directors of Teradata and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Teradata and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Teradata in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Teradata and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

34. The Individual Defendants, because of their positions of control and authority as directors and officers of Teradata, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35. As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Teradata's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Teradata's management, policies, and internal controls.

36. At all times relevant hereto, the Individual Defendants were the agents of each other and Teradata and were always acting within the course and scope of such agency.

37. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Teradata.

### A. Additional Duties Under Teradata's Code Of Conduct

38. Teradata's Code of Conduct applies to, among others, all directors, officers, and employees of the Company. The Code of Conduct states that while "we hold everyone from the top down to the same standards of conduct… we hold company executives and board members to even higher standards and expectations."

39. The Code of Conduct requires all directors, officers and employees to report any potential violations of the Code of Conduct to either a manager or a Teradata Ethics & Compliance Office or the Ethics Helpline and states: "No matter their level of seniority of role at Teradata, anyone who violates the Code [of Conduct], our policies, or laws will be subject to appropriate disciplinary action, up to and including termination of employment . . . ."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

40. The Code of Conduct prohibits insider trading while in possession of material non-public information:

> Insider trading is the illegal act of buying, selling, or otherwise trading in securities while in the possession of material non-public information about Teradata, its customers, its business partners, or others with which Teradata has or is considering a business relationship. Insider trading is a serious violation of our Code, the Teradata Insider Trading Policy (see Corporate Management Policies CMP 922 and CMP 922Q), as well as state and federal securities laws, and could subject the individuals involved to immediate termination and potential criminal prosecution.

41. The Code of Conduct emphasizes the need to "keep full fair, accurate and timely books and records of all business transactions" and mandates the retention of such records:

> All our financial entries and records… and project finances and reporting must fairly and accurately reflect the true nature, amounts, relevant actual dates, involved parties, and purpose of the spending/ transaction or project, as the case may be.

> All Teradata associates are required to make certain that Teradata's books and records are accurate. We need to ensure all the reports we make—including the recording of time worked, business expenses incurred, and all other business-related activities—and all receipts and other supporting documentation, dates and information are not falsified, misleading, or forged in any way.

**B.     Additional Duties Under Teradata's Corporate Governance Guidelines**

42. Teradata's Corporate Governance Guidelines state the following regarding the Board and its Committees' role in risk oversight:

> The Board is responsible for oversight of the Company's risk management activities. In fulfilling this role, the Board focuses on understanding the nature of Teradata's enterprise risks, including its operations and strategic direction, as well as the adequacy of the risk management process and overall risk management system, including plans to mitigate and manage risk. The Board receives quarterly management updates, including on business operations, financial results, strategy, and risks. The Audit Committee, Nominating and Governance Committee, and Compensation and People Committee assist the Board by reviewing and assessing risks relevant for such committee, as appropriate. The Audit Committee also oversees the Company's enterprise risk management process, including identifying major risk exposures such as financial, business operations . . . business continuity, talent, ESG, and legal and regulatory risks, and steps management has taken to monitor and control such exposures. The Audit Committee also receives internal audit and ethics and compliance updates, including whistleblower updates, if any. Through these management updates and committee reports, the Board monitors risk management activities, including enterprise risk management, risks relating to compensation programs, and financial and operational risks being managed by Teradata.

43.    The Corporate Governance Guidelines also note the Board's active engagement in oversight of Teradata's business plans and strategy:

> The Board engages in active discussion and oversight of Teradata's business plans and strategy, which management is responsible for establishing. The Board dedicates a full meeting each year to review and discuss the Company's strategy and monitors execution of the strategy periodically throughout the year. As part of this process, the Board considers management's plans to capture opportunities and balance risks against potential stockholder returns in light of many factors, such as Teradata's competitive landscape, technology developments, organizational structure and financial objectives, among other things. In connection with its strategic planning activities, the Board also . . . oversees the integrity of its financial statements and long-term financial targets, and considers enterprise opportunities and risks. In addition, the Board regularly reviews and monitors the Company's operating plans to confirm alignment with the established strategic initiatives and provide ongoing input and direction to management.

**C.    Additional Duties Of Audit Committee Members**

44.    The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, internal audit, financial reporting and legal matters; the integrity of the Company's financial statements; and the Company's compliance with legal and regulatory requirements.

45.    Audit Committee members are required to, among other things:

- Assist in the Board's oversight of the (i) Company's financial reporting, auditing and internal control activities; (ii) integrity of the Company's financial statements, (iii) Company's compliance with ethical, legal and regulatory requirements, (iv) qualifications, independence and performance of the Company's independent accountants; (v) qualifications and performance of the Company's internal audit function; and (vi) Company's overall risk exposure and management.

- Prepare the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission for inclusion in the Company's proxy statement.

- Review and discuss with management and the Company's independent accountants the annual audited financial statements and quarterly unaudited financial statements, including disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations, prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q with the SEC, and recommend to the Board that the audited financial statements be included in the Company's Form 10-K filing.

- Direct the independent accountants to review before filing with the SEC the Company's interim financial statements included in the Quarterly Reports on

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Form 10-Q, using applicable professional standards and procedures for conducting such review.

- Discuss with management and the independent accountants all critical accounting policies and practices used, [and] any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

- Review earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies prior to public disclosure.

- Review with the independent accountants, the internal auditors, and management as appropriate, the internal audit scope and plan, the results of internal audit activities, and the adequacy of internal controls and the Company's financial accounting and reporting processes.

- Receive periodic reports from the internal auditors on findings of fraud as well as significant findings regarding the design and/or operation of internal controls as well as management responses.

- Review with management, or such others as the Committee deems appropriate, the adequacy and effectiveness of the Company's internal controls and disclosure controls and procedures, including management's report assessing the adequacy and effectiveness of the Company's internal control over financial reporting prior to the inclusion of such report in the Company's Annual Report on Form 10-K, and disclosures made by the Company's principal executive officer and principal financial officer during their certification process for the Company's Annual Report on Form 10-K and quarterly reports on Form 10-Q about the results of their evaluation of the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting and any significant deficiencies and material weaknesses in the design or operation of such controls and procedures and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Review and discuss with management the Company's guidelines and policies regarding financial and enterprise risk management and risk appetite including major risk exposures such as, financial, business continuity, legal and regulatory risks, and regularly discuss management's plans related to these areas and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board.

- Review management's monitoring and enforcement of the Company's Code of Conduct, which includes the code of ethics for its senior financial officers.

- Oversee the Company's program for monitoring compliance with laws and regulations and the Company's ethical standards and receive reports on significant ethics and compliance investigations or matters.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

46.    Teradata is a global provider of cloud-based data analytics and data warehouse solutions. Headquartered in San Diego, California, Teradata specializes in delivering enterprise-level analytics services through its proprietary platforms, including Teradata Vantage and, more recently, VantageCloud. The Company services a wide range of industries, including financial services, telecommunications, retail, manufacturing, and government.

47.    Teradata's business model centers on helping organizations store, consolidate, analyze, and process large-scale data sets. By efficiently managing and enabling real-time insights into large datasets, Teradata professes to help organizations make faster, data-driven decisions, improve operational efficiency, and respond quickly to business challenges and opportunities.

48.    Historically, Teradata generated revenue by selling on-premises hardware and software systems for storage and processing. In recent years, however, the Company has shifted to a "cloud-first" model, transitioning its offerings to cloud-based subscriptions and consumption-based services hosted on public cloud infrastructure.

49.    Teradata has marketed its transition to the cloud as essential to its long-term growth, with executives repeatedly stating that Public Cloud ARR would be a key driver of shareholder value. In particular, the Company publicly committed to reaching over $1 billion in Public Cloud ARR by fiscal year 2025.

### B.    The Company, Its Directors And Officers Mispresent The Company's Financial Condition

50.    On February 13, 2023, Teradata filed with the SEC a Current Report on Form 8-K and attached a press release announcing its financial results for the fourth quarter and full year ended December 31, 2022. The press release stated: "We remain on-track to achieve over one billion dollars of cloud ARR in 2025 while driving future margin expansion and free cash flow growth." On a conference call with financial analysts and investors the same day, CFO Bramley noted: "We are not seeing any significant changes to customer behavior. We are seeing a little bit of scrutiny, but as I

mentioned in my prepared remarks, that's not pervasive." The Company also issued guidance for 2023 with Public Cloud ARR "expected to increase in the range of 53% to 57% year-over-year" and Total ARR "expected to increase in the range of 6% to 8% year-over-year."

51.    On February 24, 2023, Teradata filed its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"), which was signed by Defendants McMillan, Bramley, Chou, Gianoni, and Schwarz. In the 2022 10-K, these directors and officers confirmed the Public Cloud ARR and Total ARR guidance for full year 2023.

52.    On March 7, 2023, at the Morgan Stanley Media and Telecom Conference, Defendant McMillan discussed the Company's confidence in its 2023 guidance:

> So in 2023, the reason we have confidence in terms of our 2023 guidance is because a lot of our cloud growth is actually going to be funded from that migration from on-prem to the cloud.
>
> ***
>
> And the reason that we felt confident in terms of recommitting to those metrics for 2025 is because our 2023 guidance set a glide path essentially to achieving that 2025 number in terms of having over a $1 billion of cloud ARR.
>
> ***
>
> And the fact that we can set these guides in terms of what we plan to do from a shareholder return perspective. And that confidence really is based on the confidence that we have in the topline because of the commitments, the contractual commitments that we have for our customers, the lack of dependence on a consumption model.

53.    On May 4, 2023, the Company filed with the SEC a Current Report on Form 8-K and attached a press release announcing its financial results for the first quarter of 2023. In the press release,  the Company reaffirmed its 2023 guidance with Public Cloud ARR "expected to increase in the range of 53% to 57% year-over-year" and Total ARR "expected to increase in the range of 6% to 8% year-over-year." Defendant McMillan stated that "Teradata is off to a strong start in 2023 with sequential growth in total ARR, and we closed one of the largest deals in Teradata's history…tangible proof points of our cloud-first strategy in action" and noted that the Company was "on track to achieve all elements of our annual outlook."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

54.     On a conference call with financial analysts and investors that day, McMillan stated that the Company had "significant confidence in the year ahead" based on its first quarter performance" and emphasized its commitment to the 2023 outlook based on the fact that it was "on track to achieve our fiscal 2025 target of more than $1 billion in cloud ARR." CFO Bramley commented that Teradata was not currently seeing "any other material headwinds impacting our business."

55.     On May 5, 2023, Teradata filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2023, which was signed by Defendant Bramley. In the 10-Q, the Company reaffirmed its Public Cloud ARR and Total ARR 2023 guidance.

56.     On August 7, 2023, Teradata filed with the SEC a Current Report on Form 8-K and attached a press release announcing its financial results for the second quarter of 2023. In the press release, the Company again reaffirmed its 2023 guidance for Public Cloud ARR and Total ARR. On a related conference call with financial analysts and investors, Defendant Bramley reiterated that the Company had "full confidence in our full year numbers and later emphasized "the high confidence in the outlook we've given for the full year." Bramley also stated: "We continue to see that kind of higher level of scrutiny on deals, but . . . still not seeing deals disappear or move away because of the macro."

57.     On August 8, 2023, Teradata filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2023, which was signed by Defendant Bramley. In the 10-Q, the Company reaffirmed its Public Cloud ARR and Total ARR 2023 guidance.

58.     On November 6, 2023, the Company filed with the SEC a Current Report on Form 8-K and attached a press release announcing its financial results for the third quarter of 2023. In the press release, the Company reaffirmed its Public Cloud ARR and Total ARR 2023 guidance.

59.     On the same day, on a conference call with financial analysts and investors, Defendant Bramley stated that the Company had "sustained and increased our cloud momentum as a result of greater market awareness and customer demand" and remained "on track to achieve the outlook

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

ranges we previously provided for 2023." Bramley also noted that the Company was "steadfast on executing against our cloud-first profitable growth strategy with the goal of continuously increasing shareholder value" and confident "that total and cloud ARR dollar growth will increase sequentially and ***will be within our annual outlook ranges***." Bramley later commented that Teradata's "forecast indicates we will land within our 2023 outlook ranges for ARR, revenue and free cash flow." Bramley painted a bright future beyond 2023, with the Company "on track and confident on the path to achieve our financial goals for 2025." Defendant McMillan seconded the Company's confidence "in the guidance that we've given for Q4" and the continued execution of the team."

60.    Teradata's Quarterly Report on Form 10-Q, filed with the SEC that day and signed by Bramley again reiterated the Company's 2023 guidance.

### C.    Defendant Bramley Admits That The Company Will Need To Delay An Eight-Figure Deal

61.    On December 7, 2023, at the Barclays Global Technology Conference, Defendant Bramley acknowledged that a significant cloud deal faced timing issues that could affect year-end financial results, despite Teradata's "good pipeline":

> I think one of the things that we continue to see is that customers are making a commitment to Teradata, which is great. We have good pipeline, good coverage. I think we do continue to see deals potentially elongating in their life cycle. So that's something that definitely we're watching very closely and watching as we move into Q4, which I'm sure we'll come on to shortly.

> ***

> And actually new information that we've had in the last 24 to 36 hours is that some of -- as I mentioned about elongation of deals, ***we've got one particular deal that potentially could be pushed out of Q4.***

62.    Bramley noted that the deal was worth eight figures:

> We always have pluses and minuses. So -- and normally, we have overage in our guide. At Q3 earnings, I talked about, due to currency impact, we'll be towards the low end of our range. I think we've got one, I would say large deal, which is the kind of an 8-figure deal. So a small-- it's kind of the low end of 8 figures, ***but an 8-figure deal that potentially the timing of that could get pushed out.***

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

63.    However, Bramley later reiterated that the Company would still be at the "low end or slightly below the range for cloud ARR" even if the deal got pushed out.

64.    Following the disclosure of the delay in the large deal, Teradata's stock fell $2.89 or 6.2% per share, falling from $46.29 to close at $43.40 on December 7, 2023.

**D.    Teradata Reports That It Will Miss Cloud And Total ARR Guidance**

65.    On February 12, 2024, Teradata filed with the SEC a Current Report on Form 8-K and attached a press release announcing the financial results for the fourth quarter and full year. In the press release, the Company reported that Public Cloud ARR "increased to $528 million from $357 million, an increase of 48%" (46% in constant currency) and Total ARR "increased to $1.570 billion from $1.482 billion," an increase of 5% in constant currency. Notably, the Company missed its Public Cloud ARR guidance of 53% to 57% and its Total ARR guidance of 6% to 8%, which Teradata and its executives had repeatedly assured was well within reach.

66.    The Company issued weak Public Cloud and Total ARR guidance for 2024, with the expectation of Public Cloud ARR growth of "35% to 41% year-over-year" and Total ARR growth of "4% to 8% year-over-year."

67.    On a conference call with financial analysts and investors, Defendant McMillan emphasized that the Company primarily missed its guidance "due to deal timing issues" and noted that there "was a handful of large deals that slipped out of December" with each worth "$2 million or more of cloud ARR growth":

> [W]e ended the year below our 2023 outlook for cloud and total ARR. This was primarily due to deal timing issues. Let me explain.
>
> We are seeing that Teradata is becoming even more strategic to corporations and touching all levels of our customers' organizations. For example, we have historically dealt primarily with IT. Over time, we have moved beyond IT with multiple business units now relying on Teradata. This brings in more executive decision makers, including the Board, in order to close the deal.
>
> These dynamics cause a number of transactions to move into 2024. Of these, there was a handful of large deals that slipped out of December and each were worth $2 million or more of cloud ARR growth. This includes the low 8-figure deal Claire mentioned at an investor conference in December.

68.    Defendant Bramley later elaborated that the Company's outlook "did not fully capture the unexpected deal cycle elongation we saw during the final weeks of the year."

### E.    Defendants McMillan And Bramley Admit Prior Knowledge Of Customer Exits

69.    On the February 12, 2024 earnings call, Defendant McMillan also admitted that the Company would continue to see substantial erosion for its on-premises solution, which would negatively impact Total ARR in the first half of 2024 based on customer decisions that were made more than three years earlier:

> We do see, however, some headwinds this year as we expect a few large on-prem erosion to negatively impact total ARR in the first half of 2024. They are related to customer decisions that **were made more than 3 years ago** before we introduced our cloud-first strategy and VantageCloud platform. While we have known that these erosions were contemplated for some time, we've improved our visibility into the timing and are now able to factor these actions into our 2024 outlook.
>
> ***
>
> ***We have 2 major on-prem erosions that we've known about for some time.*** In fact, multiple years, before we actually launched our VantageCloud platform, we've known about these intent to erode that on-prem capability. Clearly, it doesn't – that's not impact our cloud ARR, but it does impact our total ARR. And the timing of those erosions in 2024, as we work with the customers to nail down when the timing ends of those erosions, we are able to factor that into the 2024 guidance that we just gave. So we had also backed [sic – factored in] those erosions because we've known about them for some time, and to our 2025 goals when we set those goals.

70.    Defendant Bramley confirmed the future "on-prem erosion" which would have an "approximate 4% to 5% negative impact" to Total ARR in the "first quarter of 2024" and impact "recurring revenue, creating a 2 percentage point impact for the full year." Bramley also emphasized that the "overall erosion and the risk of these customers was ***known***, we've been tracking them very closely, ***so no surprise***."

71.    On March 4, 2024, Defendant Bramley, spoke at the JMP Securities Technology Conference and elaborated on the "erosion" of these customers:

> So an erosion is the fact that their spend with us has reduced. So the total ARR has eroded down. So we talk about erosion. Sometimes it can be a full erosion and the customer leaves us. But quite often, it's kind of -- is a partial erosion. So that's why we talk about erosion.

72. Bramley stated that the exit of these customers "wasn't a surprise for us," and explained that Teradata had tried to retain them through new product offerings but failed to keep several large customers:

We've been obviously working with those customers trying to win them back over the past couple of years showing them new product introductions.

Some customers we've been successful in terms of winning them back, but there is a couple of large customers that are leaving Teradata at the beginning of Q1. But that's kind of -- it was anticipated from a kind of a long-range plan standpoint, but wasn't anticipated in terms of the exact timing because it's super difficult to predict because they kind of wait until everything has been set up in the parallel system and then they kind of say, right, we're ready to turn it off. But so you only -- you don't get necessarily much advanced notice on that.

73. On June 12, 2024, during the UBS Women in Tech Summit, Defendant Bramley again confirmed that Teradata's senior leadership had long known about the impending departures of large on-prem customers: "So in Q1 of 2024, we did see, I would say, some outsized erosions of a couple of larger enterprises that did move off of Teradata. *Now, interestingly, we've known about that for many years.* They've been trying to move off of Teradata for three to four years."

74. While acknowledging the severity of losing such customers, Bramley tried to spin the lack of a surprise as an asset: "So clearly, you never want to lose a customer. That's never a good thing. *But the good thing is that we weren't surprised.* And we had been trying to work with them to keep them on Teradata. But reason that they moved is also -- it's not good news, but it's interesting."

75. Financial analysts were surprised by the missed guidance and the Company's failure to disclose the exodus of certain large on-premise customers for *several years*. Guggenheim, for instance, published a report questioning whether these departures and deal slippages should have already been accounted for, given prior executive statements, particularly those by Defendant Bramley in December 2023, noting: "We can't help but think that this should have already been baked into forecasts." Other financial firms, such as Bank of America and Morgan Stanley, downgraded Teradata's stock, pointing to on-prem erosion creating risks of future migration pipeline, and expressing concern about Teradata's long-term growth trajectory and credibility of management's

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

guidance. Craig-Hallum found it troubling that FY'25 targets were lowered earlier due to external factors like FX and Russia, yet Teradata still failed to reflect known customer churn in later forecasts. Multiple analysts noted that these developments reignited concerns about the competitive landscape and cast doubt on the stability of the Company's traditional on-prem business.

### F.    Teradata Is Sued In A Securities Class Action Lawsuit

76.    On June 14, 2024, a securities class action lawsuit was filed captioned *Ostrander v. Teradata Corporation et al.*, No. 3:24-cv-01034-CAB-MSB. On December 6, 2024, a second amended complaint was filed against the Company, CEO McMillan, and CFO Bramley alleging violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC by the named defendants and Section 20(a) of the Exchange Act by the officer defendants (the "Securities Class Action Complaint"). The lawsuit seeks damages on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Teradata securities between February 13, 2023, and February 12, 2024, inclusive. The lawsuit alleges that the named defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and financial condition. Specifically, the named defendants failed to disclose that: (i) large on-prem customers had already notified the Company of their intent to leave Teradata for its competitors; (ii) deals for its cloud subscription were taking longer to close; and (iii) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

> **1.    Securities Class Action confidential witnesses[3] reveal that Company executives, including Defendants McMillan and Bramley, knew that Teradata was suffering from deal elongation and customer erosion which affected the Company's ability to meet its ARR guidance**

77.    Multiple former Teradata employees have confirmed that the Company's top executives, including Defendant McMillan and Bramley, knew of significant sales delays and the risk of deal slippage—issues that directly affected the Company's ability to meet its ARR guidance.

---

[3] While Plaintiff and the undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein. The Confidential Witness ("CW") allegations herein are based upon allegations contained in the Securities Class Action complaint.

78.     CW1, a Sales Operations Executive from September 2021 through January 2024, explained that deal slippage was a recurring problem at Teradata, often caused by skepticism over Teradata's product roadmap. CW1 stated that customers would commonly purchase short-term extensions while considering continuing their relationship with the Company. CW1 described this dynamic as "a constant battle to try and win them back," and confirmed that "we had a lot of erosion."

79.     CW1 further explained that deal forecasts were reviewed weekly using Salesforce and constantly tracked. For large deals, meetings were held at least weekly—sometimes daily—to assess risk and projected close timelines. According to CW1, these discussions were escalated to senior leadership, and CFO Bramley and CEO McMillan were informed of the risks associated with specific deals not closing.

80.     CW2, a Senior Director, Microsoft Global from August 2021 to November 2023, described how Teradata's refusal to make necessary infrastructure investments and implement features requested by customers led to frequent delays in closing deals. Customers insisted on receiving firm roadmaps, proofs of concept, and pilot programs as conditions for commitment. CW2 reported that outages and technical failures were common, and clients demanded corrective action before proceeding with contracts.

81.     During weekly sales calls, CW2 and other team members voiced concerns about unrealistic deal projections. CW2 stated that Chief Revenue Officer Todd Cione pressured sales staff to alter close dates in Salesforce to show imminent deal closures, even when sales teams disagreed. CW2 confirmed that the risks of closing deals were discussed during calls attended by top executives and that the C-suite was aware of the delays and obstacles impeding key transactions.

82.     CW3, a Senior Enterprise Account Executive during the Class Period, stated that Teradata's product often failed to function in customer environments, resulting in lost or delayed deals. CW3 recounted that in September 2023, Teradata was forced to perform a mock demonstration for Cable One because the actual product features were not operational. The non-functioning elements

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

included AI modeling, analytics capabilities, and Google integration. Despite these deficiencies, sales staff were instructed to present the product as fully functional.

83.    CW3 further confirmed that all deals were entered into Salesforce and closely monitored by senior executives. CW3 stated: "I knew [this] because the C-level would have meetings with the SVPs, the SVPs would have meetings with the directors, and they would have meetings with us to express concerns they have with some of the numbers."

### G.    Defendant McMillan Profits From The Misconduct

84.    From February 22, 2023, through November 8, 2023, while the Company's stock was inflated due to the false and misleading statements and omissions alleged herein, Defendant McMillan sold a substantial amount of his Teradata shareholdings while in possession of material non-public information, collectively selling more than 46,909 Teradata shares, and reaping nearly $2 million in illegal proceeds:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| 2/22/2023 | 8,409 | $41.01 | $344,853 |
| 5/9/2023 | 12,500 | $43.88 | $548,500 |
| 8/9/2023 | 12,500 | $46.00 | $575,000 |
| 11/8/2023 | 12,500 | $41.04 | $513,000 |

### H.    Teradata's False And Misleading Proxy Statements

85.    On March 22, 2023, the Company filed its 2023 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants McMillan, Fishback, Nelson, and McElhatton to the Board and approve executive compensation, the Teradata 2023 Stock Incentive Plan, and the Teradata Employee Stock Purchase Plan. The Proxy Statement was issued by order of the Board.

86.    The 2023 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

[O]ur board's role is to engage in informed risk oversight, including our established risk appetite. The Board recognizes that effective risk oversight is important to the success of our strategy and an integral part of fulfilling its fiduciary duties to the Company and our stockholders. The Board believes taking well-considered risk is a critical component of innovation and effective leadership, but also recognizes that

- 22 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

imprudently accepting risk or failing to appropriately identify and mitigate risk could negatively impact our business and shareholder value. The Board therefore seeks to foster a risk-aware culture that conforms to an established risk appetite framework while encouraging thoughtful risk taking in pursuit of the Company's strategy.

87. The 2023 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company, the adequacy of the Company's internal controls, and compliance with all legal requirements:

> [T]he Audit Committee assists the board in its oversight of risk management by overseeing the Company's enterprise risk management process, including monitoring application of risk appetite, major risk exposures such as financial . . . ESG (including operational, sustainability, and technology risks), and legal and regulatory, and the steps management has taken to monitor and control such exposures; quality and integrity of financial reports; compliance with applicable legal and regulatory requirements; quality and performance of our external auditor; our general policies and procedures regarding accounting and financial matters and internal controls; and our code of conduct and ethics program, including whistleblower updates, if any[.]

88. The 2023 Proxy Statement represents that the Nominating and Governance Committee "reviews the board's corporate governance practices and procedures."

89. The 2023 Proxy Statement represents that Teradata and its Board are committed to robust corporate governance practices, stating that the Board "employs a *strong* framework of corporate governance practices."

90. The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy Statement, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

91. On May 12, 2023, Teradata filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants McMillan, Fishback, Nelson and

McElhatton to the Board and the approval of executive compensation, the Teradata 2023 Stock Incentive Plan and the Teradata Employee Stock Purchase Plan pursuant to the solicitation in the 2023 Proxy Statement.

92.     On March 26, 2024, the Company filed its 2024 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Chou, Schwarz, and Bacus to the Board and approve executive compensation and the amended and restated Teradata 2023 Stock Incentive Plan. The Proxy Statement was issued by order of the Board and signed by Defendant Gianoni.

93.     The 2024 Proxy Statement contained similar false and misleading statements and omissions as the 2023 Proxy Statement regarding the Board's oversight and monitoring of the Company's risk exposures, the robust oversight of Teradata's Board-level committees, and Teradata's commitment to good corporate governance practices.

94.     On May 17, 2024, Teradata filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants Chou, Schwarz and Bacus to the Board and the approval of the executive compensation and the amended and restated Teradata 2023 Stock Incentive Plan pursuant to the solicitations in the 2024 Proxy Statement.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively and for the benefit of Teradata to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Teradata and violations of Section 14(a) of the Exchange Act, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

96.     Teradata is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has been at all relevant times, a stockholder of Teradata and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and fairly represent the interests of Teradata in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

98.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### A.      Demand Upon Defendant McMillan Is Excused

99.     Defendant McMillan is the President and CEO of Teradata and has been a Teradata director since June 2020. McMillan, therefore, is not independent. As an employee of Teradata, the Company provides Defendant McMillan with his principal occupation, from which he receives substantial compensation. In 2023 and 2024, Defendant McMillan received total compensation packages of $14,732749 and $17,418,309, respectively. Indeed, Teradata's 2025 Proxy Statement does not list McMillan as an independent director.

100.     McMillan had a powerful incentive to inflate Teradata's stock price through false and misleading financial information in order to profit from insider sales. McMillan sold 46,909 Teradata shares while in possession of material adverse non-public information, reaping proceeds of nearly $2 million. Thus, through the Individual Defendants' material omissions and misrepresentations to the market about Teradata's financial condition, McMillan reaped a material personal benefit not shared with other Terada stockholders from the misconduct pled herein.

101.     In addition to lacking disinterest due to his receipt of material personal benefits as a result of the misconduct challenged herein, McMillan faces a substantial likelihood of liability because he traded on material, nonpublic information and because he disseminated false and misleading information about the Company to the market.

102.     McMillan is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

103.     McMillan signed the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

104.    McMillan benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

105.    Defendants McMillan, Olsen, and Schwarz had a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. McMillan, Olsen, and Schwarz worked alongside each other for years in senior positions at IBM Corporation ("IBM").

106.    Further, Olsen, McMillan, and McElhatton worked together at Oracle Corporation ("Oracle") for several years, which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.

107.    McMillan, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

108.    McMillan further breached his fiduciary duties to Teradata by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

109.    McMillan is neither independent nor disinterested. Any demand upon Defendant McMillan is futile and, thus, excused.

**B.    Demand Upon Defendant Bacus Is Excused**

110.    Bacus authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

111.    Bacus benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2024 Proxy Statement.

112.    Bacus, as a member of the Nominating and Governance Committee, had a duty, among others, to ensure the implementation and effectiveness of Teradata's Code of Conduct and Corporate Governance Guidelines. Bacus utterly failed to perform these duties.

113.    Bacus, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

114.    Bacus breached her fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

115.    Bacus is neither independent nor disinterested. Any demand upon Defendant Bacus is futile and, thus, excused.

**C.    Demand Upon Defendant Chou Is Excused**

116.    Chou authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

117.    Chou benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2024 Proxy Statement.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

118.    Chou, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

119.    Chou breached his fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

120.    Chou is neither independent nor disinterested. Any demand upon Defendant Chou is futile and, thus, excused.

**D.    Demand Upon Defendant Fishback Is Excused**

121.    Fishback authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

122.    Fishback benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

123.    Fishback, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large-on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

124.    Fishback breached his fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

125.    Fishback is neither independent nor disinterested. Any demand upon Defendant Fishback is futile and, thus, excused.

**E.    Demand Upon Defendant Gianoni Is Excused**

126.    Gianoni authorized the 2023 Proxy Statement and signed the 2024 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

127.    Gianoni, as Chair of the Nominating and Governance Committee, was responsible, among other things, for ensuring the implementation and effectiveness of Teradata's Code of Conduct and Corporate Governance Guidelines. However, Gianoni utterly failed to perform these duties.

128.    Gianoni, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

129.    Gianoni breached his fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

130.    Gianoni is neither independent nor disinterested. Any demand upon Defendant Gianoni is futile and, thus, excused.

**F.    Demand Upon Defendant McElhatton Is Excused**

131.    McElhatton authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132.    McElhatton benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

133.    McElhatton, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Teradata's compliance with relevant laws, rules, and regulations. McElhatton utterly failed to perform these duties.

134.    Olsen, McMillan, and McElhatton worked together at Oracle for several years which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.

135.    McElhatton, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

136.    McElhatton breached his fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

137.    McElhatton is neither independent nor disinterested. Any demand upon Defendant McElhatton is futile and, thus, excused.

### G.    Demand Upon Defendant Nelson Is Excused

138.    Nelson authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

139.    Nelson benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

140.    Nelson, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Teradata's compliance with relevant laws, rules, and regulations. Nelson utterly failed to perform these duties.

141.    Nelson, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

142.    Nelson breached her fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

143.    Nelson is neither independent nor disinterested. Any demand upon Defendant Nelson is futile and, thus, excused.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**H.    Demand Upon Defendant Olsen Is Excused**

144.    Olsen authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

145.    Olsen, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Teradata's compliance with relevant laws, rules, and regulations. Nelson utterly failed to perform these duties.

146.    Defendants McMillan, Olsen, and Schwarz had a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. McMillan, Olsen, and Schwarz worked alongside each other for years in senior positions at IBM.

147.    Further, Olsen, McMillan, and McElhatton worked together at Oracle for several years which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.

148.    Olsen, as a director of Teradata, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

149.    Olsen breached her fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

150.    Olsen is neither independent nor disinterested. Any demand upon Defendant Olsen is futile and, thus, excused.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### I.    Demand Upon Defendant Schwarz Is Excused

151.    Schwarz authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

152.    Schwarz benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Teradata Board through the false and misleading statements and material omissions in the 2024 Proxy Statement.

153.    Defendants McMillan, Olsen, and Schwarz had a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. McMillan, Olsen, and Schwarz worked alongside each other for years in senior positions at IBM.

154.    As a director of Teradata, Schwarz was required to: (1) implement and maintain an effective system of internal controls to ensure the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Schwarz failed to discharge these duties.

155.    Schwarz breached his fiduciary duties to Teradata by, *inter alia*, allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

156.    Schwarz is neither independent nor disinterested. Any demand upon Defendant Schwarz is futile and, thus, excused.

**J.    Other Factors Demonstrating That Demand Upon The Teradata Board Is Excused**

157.    Teradata has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

158.    The members of the Teradata Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent, objective judgment in deciding whether to bring this action.

159.    Publicly traded companies, such as Teradata, typically carry director and officer liability insurance from which the Company could recover some or all of its losses.  However, such insurance normally contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Teradata's damages.

**VII.   CLAIMS FOR RELIEF**

**<u>COUNT ONE</u>**
**Against the Individual Defendants for**
**Violations of Section 14(A) of the Exchange Act**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

161.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

162.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

163.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

164.    Under the direction of the Individual Defendants, the 2023 and 2024 Proxy Statements failed to disclose that the Individual Defendants each violated their fiduciary duties to Teradata and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large-on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  Further, the 2023 and 2024 Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and its Committees.

165.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading and omitted material information.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

166.    The false and misleading statements in, and information omitted from, the 2023 and 2024 Proxy Statements were material to Teradata's shareholders in determining whether to, among other things, elect Defendants McMillan, Fishback, Nelson, Chou, Schwarz, Bacus, and McElhatton to the Board and approve executive compensation, the Teradata 2023 Stock Incentive Plan, the Teradata Employee Stock Purchase Plan, and the amended and restated Teradata 2023 Stock Incentive Plan.

167.    The material misstatements and omissions in the 2023 and 2024 Proxy Statements damaged the Company.

168.    Plaintiff, on behalf of Teradata, seeks relief for damages inflicted upon the Company based on the misleading 2023 and 2024 Proxy Statements in connection with the improper election of Defendants McMillan, Fishback, Nelson, Chou, Schwarz, Bacus, and McElhatton to the Board and the approval of executive compensation, the Teradata 2023 Stock Incentive Plan, the Teradata Employee Stock Purchase Plan, and the amended and restated Teradata 2023 Stock Incentive Plan.

### COUNT TWO
**Against the Individual Defendants**
**for Breach of Fiduciary Duties**

169.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

170.    The Individual Defendants owed and owe fiduciary duties to Teradata. Because of their fiduciary relationships, the Individual Defendants specifically owed and owe Teradata the highest obligation of good faith and loyalty in the administration of Teradata's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Teradata alleged herein.

171.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

172.    The Individual Defendants each violated their fiduciary duties to Teradata and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Teradata's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, based on the internal knowledge of ongoing customer erosion due to large on-premise customers not committing to Teradata's cloud offerings; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Teradata has sustained and continues to sustain significant damages, and its reputation has been irreparably damaged.

173.    The Individual Defendants further breached their fiduciary duties to Teradata by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

174.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Teradata has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

175.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE
### Against the Individual Defendants for
### Contribution for Violations of 21D of the Exchange Act

176.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

177.    Teradata is named as a defendant in a related Securities Class Action that alleges and asserts claims arising under the federal securities laws.  The Company is alleged to be liable to private

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Teradata is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct.  The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

178.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Teradata's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

179.    The Individual Defendants are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

180.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**<u>COUNT FOUR</u>**
**Against the Individual Defendants**
**for Aiding and Abetting**

181.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

182.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

183.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

184.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

185.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT FIVE**
**Derivative *Brophy* Claim Against**
**Defendant McMillan**

186.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

187.    As a director and officer of Teradata, Defendant McMillan owed fiduciary duties of loyalty and good faith to the Company.

188.    McMillan sold Teradata stock while in possession of material nonpublic information that artificially inflated the price of Teradata stock.

189.    By selling Teradata stock while in the possession of material adverse nonpublic information that artificially inflated the price of Teradata stock, Defendant McMillan exploited his position at Teradata and breached his fiduciary duties to Teradata. Defendant McMillan improperly benefited from his breaches of fiduciary duty and is liable to Teradata for his benefit therefrom.

**COUNT SIX**
**Derivative Claim for Unjust Enrichment Against**
**The Individual Defendants**

190.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

191.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Teradata, as a result of their compensation and director remuneration, while breaching fiduciary duties owed to Teradata.

192.    Further, Defendant McMillan sold Teradata stock while in possession of material nonpublic information that artificially inflated the price of Teradata stock. As a result, Defendant McMillan profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

193.    Plaintiff, as a stockholder and representative of Teradata, seek on behalf of the Company an order from this Court ordering the Individual Defendants to disgorge and furnish restitution to Teradata of all profits, benefits, and other compensation obtained by them for their wrongful conduct and fiduciary breaches.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Teradata and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Section 14(a) and Section 21D of the Exchange Act;

(c)    Declaring that the Individual Defendants have breached and aided and abetted the breach of their fiduciary duties to Teradata and its stockholders;

(d)    Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(e)    Determining and awarding to Teradata the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)    Ordering Defendant McMillian to disgorge and pay to the Company all profits, obtained by his insider trading and breaches of fiduciary duties;

(g)    Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(h)    Awarding Teradata restitution from the Individual Defendants, and each of them;

(i)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', consultants' and experts' fees, costs, and expenses; and

(j)    Granting such other and further relief as the Court may deem just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: May 2, 2025                    **WEISS LAW**

**OF COUNSEL:**                 By:    _/s/ Joel E. Elkins_

**WEISS LAW**                        Joel E. Elkins
David C. Katz                        611 Wilshire Blvd., Suite 808
Mark D. Smilow                       Los Angeles, CA 90017
305 Broadway, 7th Fl.                Telephone:  310/208-2800
New York, NY 10007                   Facsimile:  310/209-2348
Telephone: (212) 682-3025
Facsimile: (212) 682-3010            *Attorneys for Plaintiff Solomon Lipshutz*
Email: dkatz@weisslawllp.com
         msmilow@weisslawllp.com

Joshua M. Rubin
Jonathan Meer
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com
         jmeer@weisslawllp.com

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT